## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| JOHN A. KERNAGHAN, Derivatively On Behalf of JARDEN CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>MARTIN E. FRANKLIN, IAN G.H. ASHKEN, JAMES E. LILLIE, JOHN DAVID TOLBERT, DOUGLAS W. HUEMME, RICHARD L. MOLEN, IRWIN D. SIMON, ROBERT L. WOOD, RENE-PIERRE AZRIA, AND CHARLES R. KAYE,<br><br>Defendants,<br><br>-and-<br><br>JARDEN CORPORATION, a Delaware corporation,<br><br>Nominal Defendant. | Civil Action No.<br><br>**06 CV 1533**<br><br>JURY TRIAL DEMANDED |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT

Plaintiff by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

### NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Jarden Corporation ("Jarden" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between June 2005 through the present (the "Relevant Period") and that have caused substantial losses to Jarden and other damages, such as to its reputation and goodwill.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiffs and each defendant, and the

- 1 -

amount in controversy exceeds \$75,000. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

3.      This Court retains general jurisdiction over each named defendant who is a resident of New York.  Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants maintain sufficient minimum contacts with New York to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Jarden maintains its principal place of business in New York, and because the allegations contained herein are brought derivatively on behalf of Jarden, defendants' conduct was purposefully directed at New York.  Defendants' conduct arose out of New York, where Jarden maintains its corporate headquarters.  Finally, exercising jurisdiction over named nonresident defendants is reasonable.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Jarden occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## SUMMARY OF THE ACTION

5.      Jarden describes itself as a leading provider of niche consumer products used in and around the home. Jarden operates in three primary business segments through three operating divisions known as Branded Consumables, Consumer Solutions and Outdoor Solutions. Branded Consumables includes a number of recognizable brands, including: Ball®, Bee®, Bicycle®, Crawford®, Diamond®, Forster®, Hoyle®, Kerr®, Lehigh®, Leslie-Locke® and Loew-Cornell®; Consumer Solutions: Bionaire®, Crock-Pot®, First Alert®, FoodSaver®, Harmony®, Health o meter®, Holmes®, Mr. Coffee®, Oster®, Patton®, Rival®, Seal-a-Meal®, Sunbeam®, VillaWare® and White MountainTM; and Outdoor Solutions: Campingaz® and Coleman®.

6.      Jarden completed two corporate acquisitions in 2005: American Households, Inc.("AHI") (formerly known as Sunbeam Corporation) and Holmes Group, Inc. ("HGI").  Jarden

acquired Holmes as a newly formed wholly owned subsidiary through an Agreement and Plan of Merger. The acquisition of AHI, however, produced a substantial financial burden on Jarden. In 2004, Jarden maintained working capital of slightly above $200 million. To complete the acquisition of AHI, Jarden was required to pay AHI's previous owners and their creditors $845.6 million. The AHI acquisition was completed by Jarden selling $350 million worth of convertible preferred stock (the "Convertible Stock") to two private equity firms Warburg Pincus, LLC ("Warburg Pincus") and Catterton Partners ("Catterton").

7.     Jarden sold the Convertible Stock to Warburg Pincus and Catterton on the following terms:

(a)     Jarden was required to pay the Convertible Stock investors paid-in-kind dividends associated with the preferred stock, further diluting Jarden's capital;

(b)     Jarden was required to allow the Convertible Stock investors to designate a director to the Company's Board of Directors (the "Board"), further diluting the control and oversight of common stockholders; and

(c)     Jarden was required to repay the Convertible Stock investors on an accelerated schedule.

8.     Pursuant to the terms of the Convertible Stock, the only way for Jarden to avoid the financial strain of purchasing AHI was to convert the Convertible Stock to common stock. In order for Jarden to force the conversion of the Convertible Stock to common stock, the price of Jarden common stock needed to rise rapidly within a relatively short period of time.

9.     On June 23, 2005, Jarden entered into a new employment contract with defendant Martin E. Franklin ("Franklin"). The new employment contract with Franklin included numerous incentives which directly linked Franklin's compensation to Jarden's ability to force the conversion of Convertible Stock to common stock (i.e., Franklin's compensation drastically increased if Jarden's stock price reached the necessary price to convert the Convertible Stock). For example, 475,000 of Jarden stock would be granted to Franklin if Jarden's stock price rose above $56 per share by or before November 1, 2005. Another 440,000 shares of Jarden stock would be granted to Franklin if Jarden's stock rose to $64 per share. This enormous incentive package offered to Franklin was worth

- 3 -

approximately $25.6 million dollars if Franklin managed to cause Jarden's stock price to rise to $56 per share price (around 14 times Franklin's base salary for the year). Therefore, Franklin had a huge incentive to boost Jarden's stock price.

10.     Shortly after Jarden entered into the new employment contract with Franklin, Jarden announced the acquisition of Holmes. On June 29, 2005, Jarden delivered news to the public and Jarden shareholders that the Holmes acquisition would drastically increase Jarden's profit margins and revenue. During a teleconference, Franklin focused on Holmes' historical Earnings Before Deductions for Interest, Taxes, Depreciation and Amortization ("EBITDA"). Specifically, Franklin discussed Holmes' EBITDA in 2004, which was $95 million. Franklin, however, did not disclose that Holmes would be unable to achieve $95 million in EBITDA in 2005 because Holmes lost a deal with Procter & Gamble worth tens of millions of dollars. Franklin also did not reveal that the financial prospects he was disclosing were the identical financial numbers presented by Holmes' sellers. Franklin failed to make any adjustments in the financial numbers reflecting a diminution from Holmes' "seller hyperbole." Additionally, he failed to disclose that the merger between Jarden and Holmes was plagued by integration problems.

11.     Subsequent to the announcement regarding the Holmes acquisition and Franklin's improper withholding of Holmes' likely EBITDA in 2005, Jarden's stock price rose from $50.22 per share on June 29, 2005 to $55.20 per share on the next business day. By July 8, 2005, Jarden's stock price catapulted to $59.96 per share and was listed as a strong by CIBC World Markets investment bank.

12.     On August 14, 2005, after Jarden's failure to disclose Holmes' likely EBITDA for 2005 and integration problems stemming from the merger, Jarden exercised its rights under the Convertible Stock terms to convert the Convertible Stock to common stock.

13.     On December 31, 2005, Jarden's fourth quarter ended without Holmes replacing the tens of millions of dollars in revenue lost from the Procter & Gamble deal. Not surprisingly, Holmes' EBITDA fell from $95 million to approximately $80 million, a substantive decline of 15.8%. When Jarden's financial results were finally announced on January 11, 2006, Jarden's stock plunged by $3.37 per share (or 12% per share). During the announcement, Franklin explained what

- 4 -

Jarden insiders must have already known, "the original forecasts for Holmes provided to us at the time of the acquisition were overoptimistic."

## THE PARTIES

14.    Plaintiff John A. Kernaghan is, and was at times relevant hereto, an owner and holder of Jarden common stock. Plaintiff is a citizen of Canada.

15.    Nominal defendant Jarden is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at 555 Theodore Fremd Avenue, Rye, New York. Jarden is a leading provider of niche consumer products used in and around the home. Jarden operates in three primary business segments through a number of well recognized brands, including; Branded Consumables: Ball®, Bee®, Bicycle®, Crawford®, Diamond®, First Alert®, Forster®, Hoyle®, Kerr®, Lehigh®, Leslie-Locke® and Loew-Cornell®; Consumer Solutions: Bionaire®, Crock-Pot®, FoodSaver®, Harmony®, Health o meter®, Holmes®, Mr. Coffee®, Oster®, Patton®, Rival®, Seal-a-Meal®, Sunbeam®, VillaWare® and White Mountain™; and Outdoor Solutions: Campingaz® and Coleman®. Jarden has over 16,000 employees worldwide.

16.    Defendant Franklin is, and at all times relevant hereto was, Chairman of the Board, Chief Executive Officer ("CEO") and a director of Jarden. Because of Franklin's positions, he knew the adverse non-public information about the business of Jarden, specifically Jarden's inability to achieve the same EBITDA in 2005 from its Holmes acquisition after Holmes ended a deal with Procter & Gamble in 2004 worth tens of millions of dollars in revenue, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board and management meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Franklin participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. In June 2005, Jarden entered into a new employment contract with Franklin, which included numerous short-term incentives which directly linked Franklin's compensation to Jarden's ability to force the conversion of Convertible Stock to common stock. For FY:04, Jarden paid defendant Franklin $1,678,750 in bonus compensation,

$21,302,250 in restricted shares and $1,001,721 in salary and other compensation. During the Relevant Period, Franklin sold 844,411 shares of Jarden stock for proceeds of $ $24,911,117.43. Franklin is a citizen of New York.

17.     Defendant Ian G.H. Ashken ("Ashken") is, and at all times relevant hereto was, Vice Chairman, Chief Financial Officer ("CFO") and a director of Jarden. Because of Ashken's position, he knew the adverse non-public information about the business of Jarden, specifically Jarden's inability to achieve the same EBITDA in 2005 from its Holmes acquisition after Holmes ended a deal with Procter & Gamble in 2004 worth tens of millions of dollars in revenue, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board and management meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Ashken participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04, Jarden paid defendant Ashken $888,750 in bonus compensation, $8,188,800 in restricted shares, and $557,783 in salary and other compensation. During the Relevant Period, Ashken sold 416,782 shares of Jarden stock for proceeds of $ $13,270,946.82. Ashken is a citizen of Connecticut.

18.     Defendant James E. Lillie ("Lillie") is, and at all times relevant hereto was, President and Chief Operating Officer ("COO") of Jarden. Because of Lillie's positions, he knew the adverse non public information about the business of Jarden, specifically Jarden's inability to achieve the same EBITDA in 2005 from its Holmes acquisition after Holmes ended a deal with Procter & Gamble in 2004 worth tens of millions of dollars in revenue, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Lillie participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04, Jarden paid defendant Lillie $490,000 in bonus compensation, $332,100 in restricted shares, $414,534 in salary

- 6 -

and other compensation and 25,000 in underlying securities options. During the Relevant Period, Lillie sold 22,500 shares of Jarden stock for proceeds of $835,379.25. Lillie is a citizen of Connecticut.

19.    Defendant John David Tolbert ("Tolbert") is, and at all times relevant hereto was Senior Vice President, Human Resources and Corporate Risk of Jarden. Because of Tolbert's position, he knew the adverse non-public information about the business of Jarden, specifically Jarden's inability to achieve the same EBITDA in 2005 from its Holmes acquisition after Holmes ended a deal with Procter & Gamble in 2004 worth tens of millions of dollars in revenue, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Tolbert participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04, Jarden paid defendant Tolbert $102,375 in bonus compensation, $187,193 in salary and other compensation and 17,500 in underlying securities options. During the Relevant Period, Tolbert sold 21,764 shares of Jarden stock for proceeds of $828,379.25. Tolbert is a citizen of Indiana.

20.    Defendant Douglas W. Huemme ("Huemme") is, and at all times relevant hereto was, a director of Jarden. Huemme is also member of Jarden's Audit Committee and the Chairman of its Nominating and Policies Committee. Because of Huemme's position, he knew the adverse non public information about the business of Jarden, specifically Jarden's inability to achieve the same EBITDA in 2005 from its Holmes acquisition after Holmes ended a deal with Procter & Gamble in 2004 worth tens of millions of dollars in revenue, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Huemme participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant

- 7 -

Period, Huemme sold 12,000 shares of Jarden stock for proceeds of $458,568. Huemme is a citizen of California.

21.    Defendant Richard L. Molen ("Molen") is, and at all times relevant hereto was, a director of Jarden. Molen is also Chairman of Jarden's Executive Compensation Committee and a member of its Nominating and Policies Committee. Because of Molen's position, he knew the adverse non-public information about the business of Jarden, specifically Jarden's inability to achieve the same EBITDA in 2005 from its Holmes acquisition after Holmes ended a deal with Procter & Gamble in 2004 worth tens of millions of dollars in revenue, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Molen participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Molen is a citizen of Ohio.

22.    Defendant Irwin D. Simon ("Simon") is, and at all times relevant hereto was, a director of Jarden. Simon is also a member of Jarden's Executive Compensation Committee and its Nominating and Policies Committee. Because of Simon's position, he knew the adverse non-public information about the business of Jarden, specifically Jarden's inability to achieve the same EBITDA in 2005 from its Holmes acquisition after Holmes ended a deal with Procter & Gamble in 2004 worth tens of millions of dollars in revenue, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Simon participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Simon is a citizen of New York.

23.    Defendant Robert L. Wood ("Wood") is, and at all times relevant hereto was, a director of Jarden. Wood is also a member of Jarden's Executive Compensation Committee and its

Audit Committee. Because of Wood's position, he knew the adverse non-public information about the business of Jarden, specifically Jarden's inability to achieve the same EBITDA in 2005 from its Holmes acquisition after Holmes ended a deal with Procter & Gamble in 2004 worth tens of millions of dollars in revenue, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Wood participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Wood sold 20,000 shares of Jarden stock for proceeds of $751,240. Wood is a citizen of Connecticut.

24.     Defendant René-Pierre Azria ("Azria") is, and at all times relevant hereto was, a director of Jarden. Azria is also Chairman of Jarden's Audit Committee. Because of Azria's position, he knew the adverse non-public information about the business of Jarden, specifically Jarden's inability to achieve the same EBITDA in 2005 from its Holmes acquisition after Holmes ended a deal with Procter & Gamble in 2004 worth tens of millions of dollars in revenue, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Azria participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Azria sold 16,000 shares of Jarden stock for proceeds of $604,000. Azria is a citizen of New York.

25.     Defendant Charles R. Kaye ("Kaye") is, and at all times relevant hereto was, a director of Jarden. Because of Kaye's position, he knew the adverse non-public information about the business of Jarden, specifically Jarden's inability to achieve the same EBITDA in 2005 from its Holmes acquisition after Holmes ended a deal with Procter & Gamble in 2004 worth tens of millions of dollars in revenue, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers

and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Kaye participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Kaye is a citizen of New York.

26.     The defendants identified in ¶¶16-17, 20-25 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶16-19 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶16-20, 23-24 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

27.     By reason of their positions as officers, directors and/or fiduciaries of Jarden and because of their ability to control the business and corporate affairs of Jarden, the Individual Defendants owed Jarden and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Jarden in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Jarden and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

28.     Each director and officer of the Company owes to Jarden and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

29.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Jarden, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions

with Jarden, each of the Individual Defendants had access to adverse non public information about the financial condition, operations, and improper representations of Jarden.

30.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Jarden, and was at all times acting within the course and scope of such agency.

31.     To discharge their duties, the officers and directors of Jarden were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Jarden were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how Jarden conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

- 11 -

32.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Jarden, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Jarden's Board during the Relevant Period.

33.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein infra, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, Jarden has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel;

(b)     Costs incurred in investigating and defending Jarden and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment;

(c)     Additional costs in the form of increased directors' and officers' liability and fiduciary liability insurance premiums;

(d)     Costs incurred from directing manpower to correct Jarden's defective internal controls; and

(e)     Costs incurred in investigating and defending Jarden and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

- 12 -

34.    Moreover, these actions have irreparably damaged Jarden's corporate image and goodwill. For at least the foreseeable future, Jarden will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Jarden's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

36.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Jarden and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Jarden, regarding the Individual Defendants' management of Jarden's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

37.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least June 2005 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that Jarden was misrepresenting its financial results. In addition, defendants also made other specific, false statements about Jarden's financial performance and future business prospects, as alleged herein.

- 13 -

38.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Jarden common stock so they could: (i) dispose of over $41.6 million of their personally held stock; (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof; and (iii) use the artificially inflated Company stock to acquire companies in stock for stock transactions.

39.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

40.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**IMPROPER STATEMENTS**

41.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to Jarden a duty to insure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements. This material non-public information included Jarden's inability to achieve the same EBITDA in 2005 from its Holmes acquisition after Holmes ended a deal with Procter & Gamble in 2004 worth tens of millions of dollars in revenue.

42.     Furthermore, defendants Azria, Huemme and Wood, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter. The Audit Committee charter provides that its members should know the "type and presentation of information to be included in earnings press releases, including the use of 'pro forma' or 'adjusted' non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies."

43.     Defendants Ashken, Franklin, Lillie and Tolbert as officers of Jarden, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports.

44.     Moreover, defendants Ashken, Azria, Franklin, Huemme, Kaye, Molen, Simon and Wood, as directors of Jarden had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings. Board meetings that occurred during the Relevant Period as well as at meetings of Committees of the Board.

45.     Despite these duties, the Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by Jarden to the investing public and the Company's shareholders during the Relevant Period.

46.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to Jarden a duty to insure that the Company's public statements fairly presented, in all material respects, the Company's inability to achieve a revenue stream of $95 million from the Holmes acquisition after Holmes ended a deal with Procter & Gamble in 2004, as well as all other issues material to the Company's operations. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements.

47.     On June 29, 2005, the Individual Defendants caused or allowed Jarden to issue a press release entitled "Jarden Corporation Announces Definitive Agreement to Acquire The Holmes Group, Inc.; Strategic Transaction Will Add Complementary Product Lines and Expand Jarden's Global Distribution Platform." The press release was the first of several misleading announcements

- 15 -

by Jarden concerning the financial benefit the Holmes acquisition would provide Jarden. The press

release stated in relevant part:

> Founded in 1982, Holmes supplies consumer products for the home environment and
> kitchen markets. Holmes' established relationships with major customers and its new
> product development expertise has enabled it to secure leading market positions
> across major product categories on a global basis, including Crock-Pot(R) slow-
> cookers, Rival(R) roasters and deep fryers, and Bionaire(R) air purifiers and seasonal
> humidifiers.
>
> During the past three years, Jarden has steadily built a broad portfolio of
> category leading products and brands used in and around the home, both organically
> and through strategic acquisitions, including the Company's 2005 acquisition of
> American Household, Inc. The acquisition of Holmes will create new international
> cross-selling and distribution opportunities across Jarden's existing brand portfolio,
> particularly in Europe. Holmes has also developed its own state-of-the-art
> manufacturing, distribution and new product development facilities in China within
> the last five years, having had an active manufacturing presence in China for over
> fifteen years.
>
> ***Holmes has annual revenues of approximately $700 million and an
> adjusted non-GAAP EBITDA of approximately $95 million. Based on a $625
> million enterprise value for the business, the acquisition multiple is approximately
> 6.5 times the adjusted non-GAAP EBITDA run rate, before any synergies.***
>
> Due to the share issuance related to the Holmes transaction, the Company's
> Board has approved a stock repurchase program of one million shares. Jarden
> intends to buy back up to one million shares of Jarden common stock in the second
> half of 2005, which is expected to be funded from free cash flow generated during
> this same period.

48.     On the same day that the Individual Defendants caused or allowed Jarden to issue the

press release announcing the Holmes acquisition, Jarden held a teleconference. Franklin continued

to address the positive aspects of the Holmes acquisition without disclosing the highly probable

decrease in Holmes' EBITDA and the integration problems that would result through the merger.

Franklin stated in relevant part:

> Another advantage of Holmes is their established and effective infrastructure
> in China. By having an infrastructure in place that allows the opportunity to create
> additional Jarden wide operational efficiencies. These efficiencies range from
> logistics opportunity to the beginning the process of understanding how to further
> sell and distribute products into the Asian markets, including China. There are many
> different Jarden products that we believe will sell well in the Chinese market and we
> plan to start exploring this opportunity as part of our longer-term strategy for the
> region, following successful integration of the business. While these are indeed
> longer range planning methods, I wanted to mention it to help you gain additional

insight into the value of this acquisition presents for Jarden, both in the short-term and further down the road.

As mentioned earlier the Holmes transaction met all of our key acquisition criteria. A number of its brands are synonymous with the categories they serve and while some of these categories may be relatively mature, Holmes has continued to innovate in the market, driving consumer interest while protecting margins. The business has impressive cash flows in the second half of the year and the management team is strong, experienced and eager for the opportunity to take Holmes brands to the next level. Importantly, Holmes has a similar entrepreneurial cultural culture to that of Jarden, which bodes well for maximizing the synergistic opportunities the transaction will create.

*From a financial as well as operational perspective we believe that the Holmes acquisition is extremely attractive for our existing and new shareholders. The transaction further diversifies our product offerings giving us annualized revenue run-rate of approximately $3.4 billion. The gross margins are similar to our existing business at 27% but the transaction will help improve the time line we established for following the American Household acquisition of returning Jarden to 15% + EBITDA margins within the next three to five years. It is not a usual custom to give guidance to the street. But with June drawing to a closing and given the size of this transaction, I have asked Ian to give you a brief overview of Jarden's Q2 outlook and the impact of the Holmes transaction on earnings for 2005.*

49.     During the same teleconference, Jarden's CFO, Ashken, continued to imprudently hype the Holmes acquisition: Ashken stated in relevant part:

The Holmes transaction should offer a number of synergies. We have not fully quantified these yet, but are comfortable that we will achieve at least $15 million of cost savings within the next 24 months. *This will further help to expand margins. Holmes's historical adjusted EBITDA margins of 13 to 14% will help Jarden drive towards its overall EBITDA margins.*

50.     The day of Ashken and Franklin's misleading statements, Jarden's stock price increased from $50.22 per share on June 28, 2005 to $55.20 per share on June 29, 2005.

51.     On August 8, 2005, the Individual Defendants caused or allowed Jarden to issue a press release entitled "Jarden Corporation Elects to Convert Preferred Stock." The press release announced that Jarden had exercised its right to convert all outstanding principal and accrued dividends of its Convertible Stock used to finance the AHI acquisition into common stock on August 14, 2005. The press release provided in relevant part:

Jarden Corporation today announced that it has exercised its right to convert all outstanding principal and accrued dividends of its Series B preferred stock into

common stock, effective August 14, 2005. Upon conversion, Jarden will no longer be subject to the dilutive effect of the paid-in-kind dividends associated with the preferred stock. Following the conversion, Jarden will have approximately 70 million fully diluted shares outstanding, with Warburg Pincus LLC and its affiliates owning approximately 21% of the fully diluted shares.

52.     On October 27, 2005, the Individual Defendants caused or allowed Jarden to issue a press release entitled "Jarden Corporation Reports Third Quarter Results," announcing its financial results for the three and nine months ended September 30, 2005. Jarden continued to mislead Jarden shareholders and the investing public. The press release stated in relevant part:

> Martin E. Franklin, Chairman and Chief Executive Officer, commented, "Our businesses produced another record quarter. Our strong operating performance in the face of tough macro economic conditions shows the resilience of our diversified portfolio of brands and markets has paid off. These positive results were driven by organic growth in our Consumer Solutions and Outdoor Solutions segments, coupled with continuing synergy programs across all of our business segments. As always, credit goes to our employees whose continued hard work has enabled us to meet and exceed our stated financial and strategic objectives. *We are confident that our cash flow and other financial goals for 2005 should be achieved, which sets a platform for further success in 2006.*"

> For the nine months ended September 30, 2005, net sales increased 268% to $2,214 million compared to $602 million for the same period last year. Net income for the nine months ended September 30, 2005 increased 27.1% to $58.2 million from $45.8 million for the same period last year. Income available to common stockholders was $9.6 million or $0.19 per diluted share for the nine months ended September 30, 2005, compared to income of $1.08 per diluted share in the prior year period. On a non-GAAP basis, adjusted net income was $104.7 million or $1.60 per diluted share for the nine months ended September 30, 2005, a 48.1% increase over the same period last year.

> Mr. Franklin concluded, "We are very pleased with our year to date results. We remain focused on driving organic growth and improving margins by investing in our brands and developing innovative, compelling new product offerings that meet the needs of our consumers. We are excited about the opportunities 2006 will bring as we prepare to enter the second year of our stated three to five year strategic plan."

### THE TRUTH IS REVEALED

53.     On the morning of January 12, 2006, the Individual Defendants caused or allowed Jarden to hold a conference call to discuss its year end financial results for 2005. Defendant Franklin stated in relevant part:

The purpose of the call today is to discuss Jarden's performance in Q4 ahead of our scheduled February 14th earnings release date, as well as to preview the outlook for our business as we enter the New Year.

\*     \*     \*

The working capital cycle produced cash flow as previously forecasted, and we anticipate another strong cash flow month in January before the annual cycle starts again in February where we use cash of the seasonal build inventory in our Outdoor Solutions and Branded Consumables segments. Our fourth quarter is largely tied to the performance of our Consumer Solutions segment as it is a relatively slow order for our other three operating segments. As mentioned earlier, the legacy Sunbeam business had another strong quarter in Q4. *However, our Holmes and FoodSaver businesses did not meet expectations during the quarter. At the time of the Holmes acquisition in July 2005, we projected this business would contribute annualized adjusted EBITDA of approximately $95 million for 2005, with the vast majority of this in the second half of the year. Based on the sales mix and cost run rate in Q4, we now estimate this business will miss these projections by approximately $15 million.*

\*     \*     \*

*In hindsight, the original forecasts for Holmes provided to us at the time of the acquisition were overoptimistic. This fact [covered] with the integration of entrepreneurial business such as Holmes during the busiest season resulted in a significant burden for the management and infrastructure of the business. In short, during 2005, the business did not perform up to the level we expected it to.*

\*     \*     \*

*However, we bore the financial cost of transitioning the international operations, product mix, distribution and raw material price increases in addition to the reorganization costs involved with moving many of the back office functions from the standalone Holmes business to our fully integrated Consumer Solutions segment.*

54.    On January 12, 2006, the Individual Defendants caused or allowed Jarden to issue a press release entitled "Jarden Corporation Provides Year End Business Update." The press release stated in relevant part:

Martin E. Franklin, Chairman and Chief Executive Officer, commented, "2005 was an incredible year in the development of Jarden with the integration of two significant businesses bringing our annualized revenue base to approximately $3.5 billion. The integration of the American Household businesses was a major high point of the year, with both the Coleman and legacy Sunbeam businesses performing above our expectations. We ended this past year with strong sales and, as anticipated, we delivered strong cash flow from operations for the year."

"During the fourth quarter, in aggregate, the results of our Branded Consumables, Outdoor Solutions and Other segments as well as our legacy Sunbeam

- 19 -

business were ahead of last year and exceeded our forecast for the fourth quarter. *However, the two businesses being integrated into our Consumer Solutions segment, FoodSaver and Holmes, did not meet our expectations in the fourth quarter. That said, we view this as primarily a timing and integration issue and remain confident about both businesses, particularly regarding the synergies that we have yet to realize from the Holmes acquisition.*"

55.     After the revelation of these facts, Jarden's stock fell on January 12, 2006 $3.37 per share or 11.08 % to close at $27.05 per share.

## REASONS THE STATEMENTS WERE IMPROPER

56.     The statements referenced above were improper because they failed to disclose and/or misrepresented the following adverse facts, which were then known or should have been known by the Individual Defendants: (i) that the merger between Jarden and Holmes was rot with integration problems; (ii) that the statements concerning Holmes' potential EBITDA for 2005 were misleading and improper because Holmes had lost tens of million of dollars in revenue from a deal Holmes had with Procter & Gamble; (iii) and that the Company's statements concerning the Holmes acquisition were based on overly optimistic forecasts with no reasonable basis.

57.     As a result of the Individual Defendants' actions, Jarden's market capitalization has been damaged by over $1.16 billion, or 59% of Jarden's total market capitalization. At the same time that the defendants were causing Jarden to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $41.6 million of their personally held stock.

## ILLEGAL INSIDER SELLING

58.     While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Jarden stock:

| NAMES | DATE | SHARES | PRICE | | PROCEEDS |
|---|---|---|---|---|---|
| Ian G.H. Ashken | 12/1/2005 | 123,750 | Forward Purchase Contract | | $2,508,962.35 |
| | 11/4/2005 | 31,500 | | $35.19 | $1,108,485.00 |
| | 11/2/2005 | 127,252 | | $35.66 | $4,537,806.32 |
| | 8/2/2005 | 120,193 | | $38.05 | $4,573,343.65 |
| | 8/1/2005 | 14,087 | | $38.50 | $542,349.50 |
| | | **416,782** | | | **$13,270,946.82** |

| | | | Forward Purchase | | |
|---|---|---|---|---|---|
| Martin E. Franklin | 12/1/2005 | 355,500 | Contract | | $7,207,564.57 |
| | 11/4/2005 | 81,000 | | $35.19 | $2,850,390.00 |
| | 11/2/2005 | 281,911 | | $35.66 | $10,052,946.26 |
| | 8/2/2005 | 112,852 | | $38.05 | $4,294,018.60 |
| | 8/1/2005 | 13,148 | | $38.50 | $506,198.00 |
| | | **844,411** | | | **$24,911,117.43** |
| Rene Pierre Azria | 8/19/2005 | **16,000** | | $37.75 | **$604,000.00** |
| Douglas W. Huemme | 8/30/2005 | **12,000** | | $38.21 | **$458,568.00** |
| Robert L. Wood | 8/22/2005 | 12,000 | | $37.27 | $447,240.00 |
| | 8/19/2005 | 8,000 | | $38.00 | $304,000.00 |
| | | **20,000** | | | **$751,240.00** |
| James E. Lillie | 11/4/2005 | 7,500 | | $35.19 | $263,925.00 |
| | 8/2/2005 | 13,435 | | $38.05 | $511,201.75 |
| | 8/1/2005 | 1,565 | | $38.50 | $60,252.50 |
| | | **22,500** | | | **$835,379.25** |
| John David Tolbert | 8/1/2005 | **21,764** | | $38.09 | **$828,990.76** |
| | **TOTAL** | **1,353,457** | | | **$41,660,242.26** |

59.     In addition to the amounts listed above, on December 1, 2005, defendant Ashken transferred 123,750 shares to a brokerage firm to settle a forward purchase contract. Under the terms of the contract, Ashken was only obligated to transfer 82,500 shares. In connection, with the settlement of this contract, Ashken received $453,246.75 in addition to $2,055,715.60 that Ashken received when he first entered into the contract on December 1, 2003.

60.     Also on December 1, 2005, defendant Franklin transferred 355,500 shares to a brokerage firm to settle a forward purchase contract. In connection, with the settlement of this

contract, Franklin received $1,302,054.30 in addition to $5,905,510.27 that Franklin received when he first entered into the contract on December 1, 2003.

61. On July 8, 2005, the Individual Defendants caused or allowed Jarden to issue a press release entitled "Jarden Corporation Executive Officers Adopt 10b5-1 Plans." The press release stated, in relevant part:

> The programs are structured in substantially the same manner as their previous programs, although the typical number of shares being sold on a quarterly basis has been reduced by 33% from the previous program. *Mr. Franklin's plan provides for the sale of 54,000 shares each quarter, except for the initial sale which will be 80,000 shares. Mr. Ashken's plan provides for the sale of 21,000 shares each quarter, except for the initial sale which will be 90,000 shares. Mr. Lillie also filed his first 10b5-1 program for the period from July 2005 through October 2006, which provides for the sale of 5,000 shares each quarter, except for the initial sale which will be 10,000 shares.*

62. Thus, the Individual Defendants entered into 10b5-1 stock trading plans specifically designed to maximize their sales at the height of Jarden's stock price during the Relevant Period, while at the same time trying to exculpate themselves from the liability they knew they would incur once the material non public information in their possession was eventually disclosed.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

63. Plaintiff brings this action derivatively in the right and for the benefit of Jarden to redress injuries suffered, and to be suffered, by Jarden as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Jarden is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

64. Plaintiff will adequately and fairly represent the interests of Jarden in enforcing and prosecuting its rights.

65. Plaintiff is and was an owner of the stock of Jarden during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

66. The current Board of Jarden consists of the following eight individuals: defendants Ashken, Azria, Franklin, Huemme, Kaye, Molen, Simon and Wood. Plaintiff has not made any

demand on the present Board of Jarden to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)      As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non public information regarding Jarden's improper reporting of its business prospects.  The Insider Selling Defendants' knowledge of this adverse non-public information is further demonstrated by the 10b5-1 stock trading plans entered into by the Insider Selling Defendants.  These plan were entered into during July 2005, just days after the closing of the Holmes acquisition.  Further, the plans were designed to maximize defendants' sales during September 2005 when Jarden's stock price was trading at its Relevant Period high.   It is reasonable to infer from these circumstances that the Insider Selling Defendants deliberately designed the plans to maximize their illegal insider sales while at the same time evading liability. While in possession of this material adverse non public information regarding the Company, the following current members of the Jarden Board participated in the illegal insider selling:

(i)      During the Relevant Period, Ashken disposed of 416,782 shares of Jarden stock for proceeds of $13,270,946.82. Defendant Asken disposed of approximately 32% of his holdings during the Relevant Period;

(ii)      During the Relevant Period, Azria sold 16,000 shares of Jarden stock for proceeds of $604,000. Defendant Azria sold approximately 77% of his holdings during the Relevant Period;

(iii)      During the Relevant Period, Franklin disposed of 844,411 shares of Jarden stock for proceeds of $24,911,117.43. Defendant Franklin disposed of approximately 26% of his holdings during the Relevant Period;

(iv)      During the Relevant Period, Huemme sold 12,000 shares of Jarden stock for proceeds of $458,568. Defendant Huemme sold approximately 40% of his holdings during the Relevant Period; and

- 23 -

(v)    During the Relevant Period, Wood sold 20,000 shares of Jarden stock for proceeds of $751,240. Defendant Wood sold approximately 73% of his holdings during the Relevant Period. Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested. Also, these defendants face a substantial threat of liability for breach of their fiduciary duties for insider selling. Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile;

(b)    Jarden's entire Board was or should have been on notice that defendant Franklin maintained a major incentive to raise the Company's stock price a substantial amount over a short period of time. Further, the Board should have been on notice Franklin was offering guidance to Jarden's shareholders and the investing public regarding the prospects of the Holmes merger with no reasonable basis for such guidance. The tens of millions of dollars Holmes had lost from the Proctor & Gamble deal was a substantial sum that the Board could not dismiss as having no effect on Holmes' 2005 EBITDA. By such actions, the entire Board breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them is futile;

(c)    According to Jarden's Proxy Statement filed with the SEC on or about May, 9, 2005, defendants Azria, Huemme and Wood were, during the Relevant Period, members of the Audit Committee. The Audit Committee, according to its charter, is responsible for reviewing the interim financial statements and information with management and the independent auditors prior to the disclosure of such information to the stockholders and the public. Nevertheless, the Audit Committee allowed Franklin and Ashken to materially mislead Jarden stockholders and the public by failing to disclose that revenue from the Holmes acquisition would not meet Holmes' revenue results in 2004 because of the loss of a revenue stream of tens of millions of dollars. By such actions, defendants Azria, Huemme and Wood breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them is futile;

(d)    Defendant Kaye was placed onto the Board by Warburg Pincus and Catterton, the Company's lenders. Thus, Kaye's principal duty was to ensure that the Company was adequately

representing its financial prospects so as to protect the lenders' interests under the Convertible Stock terms. Nevertheless. Kaye did not fulfill this principal duty because he caused or allowed the dissemination of the improper statements described herein. As a result, the Company's stock price traded at artificially inflated levels thus harming Jarden's interests via exposure to liability and market credibility loss, while also harming the interests of the lenders who placed him on the Board. Accordingly, there is a substantial likelihood that Kaye faces liability for his breach of fiduciary duties owed to Jarden. Because of defendant Kaye's breach of fiduciary duties, any demand upon him is futile;

(e)    The Compensation Committee of the Board determines "corporate goals and objectives with respect to compensation for the Company's Chief Executive Officer, evaluate the Chief Executive Officer's performance in light of those goals and objectives, and, either as a committee or together with the other independent directors, determine and approve the Chief Executive Officer's compensation level based on this evaluation." The Compensation Committee of the Board also makes "recommendations to the Board with respect to non-Chief Executive Officer compensation, incentive-compensation plans and equity based plans." The Compensation Committee is comprised of defendants Molen, Simon and Wood. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Molen, Simon and Wood. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Franklin, Ashken, Azria, Huemme and Kaye is futile;

(f)    The principal professional occupation of defendant Franklin is his employment with Jarden, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Specifically, for FY:04, Jarden paid defendant Franklin $1,678,750 in bonus compensation, $21,302,250 in restricted shares and $1,001,721 in salary and other compensation. Accordingly, defendant Franklin lacks independence from defendants Molen, Simon and Wood, defendants who are not disinterested and/or independent and who exert influence over defendant Franklin's compensation by virtue of their positions as members of the Compensation

- 25 -

Committee. This lack of independence renders defendant Franklin incapable of impartially considering a demand to commence and vigorously prosecute this action;

(g)    The principal professional occupation of defendant Ashken is his employment with Jarden, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Specifically, for FY:04, Jarden paid defendant Ashken $888,750 in bonus compensation, $8,188,800 in restricted shares and $557,783 in salary and other compensation. Accordingly, defendant Ashken lacks independence from defendants Molen, Simon and Wood, defendants who are not disinterested and/or independent and who exert influence over defendant Franklin's compensation by virtue of their positions as members of the Compensation Committee. This lack of independence renders defendant Ashken incapable of impartially considering a demand to commence and vigorously prosecute this action;

(h)    The entire Jarden Board and senior management participated in the wrongs complained of herein. Jarden's directors are not disinterested or independent due to the following: defendants Ashken, Azria, Franklin, Huemme, Kaye, Molen, Simon and Wood served on the Jarden Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above referenced defendants breached the fiduciary duties that they owed to Jarden and its shareholders in that they failed to prevent and correct the improper financials. Thus, the Jarden Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Jarden to millions of dollars in liability for possible violations of applicable securities laws;

(i)    The Individual Defendants, because of their inter related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein. In addition to the conflicts that exist as a result of their participation in the improper financial reporting and insider selling, as detailed herein *supra*, the majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements:

(i)     ***Franklin and Ashken Are Long Time Business Associates***:

Defendant Franklin was the Chairman of the Board of Directors of Bolle, Inc. from February 1997 until February 2000. Defendant Ashken was CFO of Bolle, Inc. from February 1997 until December 1998 and Vice Chairman of the Board of Directors of Bolle, Inc. from 1998 until 2000. Defendant Franklin was also the Chairman and CEO of Lumen Technologies, Inc. from May 1996 until December 1998. Defendant Ashken was CFO and a director of Lumen Technologies, Inc. from May 1996 until December 1998. Additionally, defendant Franklin was Chairman and CEO of Benson Eyecare Corporation from October 1992 until May 1996. Defendant Ashken was CFO and a director of Benson Eyecare Corporation from October 1992 until May 1996. Because of their long standing and entangling business and professional relationships, neither defendant Franklin nor defendant Ashken will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

(ii)     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein;

(j)     All directors are hostile to any claims brought on behalf of Jarden for the underlying wrongs relating to the Individual Defendants' failure to disclose material information regarding integration problems associated with the Holmes merger and the overly optimistic EBITDA projections for 2005 without any reasonable basis. In a press release entitled "Jarden Reports 2005 Year End and Fourth Quarter Results," Franklin, speaking on behalf of the Individual Defendants, openly expressed Jarden's hostility toward uncovering the truth behind the improper and misleading statements described herein;

(k)     Defendant Azria, by his specialized financial expertise, was in a unique position to understand the business of Jarden, as well as its finances, markets and present and future business prospects. Specifically, defendant Azria has twenty years of corporate finance experience, working generally on large size transactions with a high degree of complexity. Azria holds a Bachelor of Mathematics from Paris-Jussieu, a Masters in Business Administration from Ecolé des Hautes Commerciales, and an International Management Degree from London Business School and the Leonard N. Stern School of Business at New York University. This defendant, because of his unique qualifications, had a heightened duty to insure the accuracy and fairness of Jarden's financials. Nonetheless, defendant Azria breached his duties by causing or allowing the improper financials described herein. As a result of this defendant's breach of his duties, any demand upon him is futile;

(l)     The Director Defendants of Jarden, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Jarden's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(m)     In order to bring this suit, all of the directors of Jarden would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(n)     The acts complained of constitute violations of the fiduciary duties owed by Jarden's officers and directors and these acts are incapable of ratification;

(o)     Each of the Director Defendants of Jarden authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(p)     Any suit by the current directors of Jarden to remedy these wrongs would likely expose the Individual Defendants and Jarden to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(q)     Jarden has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Jarden any part of the damages Jarden suffered and will suffer thereby;

(r)     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the

- 28 -

class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile; and

(s)     If Jarden's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Jarden. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Jarden against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Jarden, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Jarden to sue them, since they will face a large uninsured liability.

67.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Jarden for any of the wrongdoing alleged by plaintiff herein.

68.     Plaintiff has not made any demand on shareholders of Jarden to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Jarden is a publicly held company with over 67 million shares outstanding, and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

69.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

70.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Jarden common stock on the basis of such information.

71.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.   It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Jarden common stock.

72.     At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Jarden common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

73.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty

74.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

75.     The Individual Defendants owed and owe Jarden fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Jarden the highest obligation of good faith, fair dealing, loyalty and due care.

76.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

77.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

78.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Jarden has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

79.     Plaintiff on behalf of Jarden has no adequate remedy at law.

## COUNT III

### Against All Defendants for Abuse of Control

80.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

81.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Jarden, for which they are legally responsible.

82.     As a direct and proximate result of the Individual Defendants' abuse of control, Jarden has sustained significant damages.

83.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

84.     Plaintiff on behalf of Jarden has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Gross Mismanagement

85.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

86.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Jarden in a manner consistent with the operations of a publicly held corporation.

87.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Jarden has sustained significant damages in excess of hundreds of millions of dollars.

88.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

89.     Plaintiff on behalf of Jarden has no adequate remedy at law.

### COUNT V

### Against All Defendants for Waste of Corporate Assets

90.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

91.     As a result of the improper financial reporting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Jarden to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions/billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

92.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

93.     Plaintiff on behalf of Jarden has no adequate remedy at law.

### COUNT VI

### Against All Defendants for Unjust Enrichment

94.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

95.     By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Jarden.

96.     Plaintiff, as a shareholder and representative of Jarden, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

(a)     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

(b)     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Jarden has an effective remedy;

(c)     Awarding to Jarden restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

(d)     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(e)     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: February 24, 2006

LAW OFFICES OF THOMAS G. AMON

THOMAS G. AMON (TGA 1515)
500 Fifth Avenue, Suite 1650
New York, NY 10110
Telephone: 212/810-2431
Facsimile: 212/810-2427

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

Attorneys for Plaintiff

G:\Cases\Jarden\Complaints\Kernaghan Fed Der Cpt FINAL.doc

- 33 -

## VERIFICATION

I, JEFFREY P. FINK, hereby declare as follows:

1.      I am a member of the law firm of Robbins Umeda & Fink, LLP, counsel for plaintiff in the above entitled action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 22 day of February, 2006, at San Diego, California

JEFFREY P. FINK