UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

JOHN A. KERNAGHAN,

        Plaintiff,

  -v-                                                                     No. 06 Civ. 1533 (LTS)(MHD)

MARTIN E. FRANKLIN, et al.,

        Defendants.

-----------------------------------------------------------x

**OPINION AND ORDER**

APPEARANCES:

ROBBINS UMEDA & FINK, LLP
 By: Brian James Robbins, Esq.
    Jeffrey Paul Fink, Esq.
610 West Ash Street, Suite 1800
San Diego, CA 92101

*Attorneys for Plaintiff*

WILLKIE FARR & GALLAGHER LLP (NY)
 By: Stephen William Greiner, Esq.
787 Seventh Avenue
New York, NY 10019

*Attorney for Defendants Martin E. Franklin, Ian G.H. Ashken, James E. Lillie, John David Tolbert, Douglas W. Huemme, Richard L. Molen, Irwin D. Simon, Robert L. Wood, Rene Pierre Azria, Charles R. Kaye, and Nominal Defendant Jarden Corporation*

LAW OFFICES OF THOMAS G. AMON
 By: Thomas G. Amon, Esq.
500 Fifth Avenue, Suite 1650
New York, NY 10110

*Attorney for Plaintiff*

LAURA TAYLOR SWAIN, United States District Judge

Plaintiff John A. Kernaghan ("Plaintiff"), who asserts that he was a holder of Jarden Corporation ("Jarden") stock at all relevant times, brings this derivative action on behalf of Jarden against officers and directors of Jarden, asserting state common law claims of insider trading, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment. The Court has jurisdiction of Plaintiffs' claims pursuant to 28 U.S.C. § 1332.[1]

Defendants move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Verified Shareholder Derivative Complaint for failure to state a claim, arguing that Plaintiff failed to meet the demand requirements of Federal Rule of Civil Procedure 23.1 and that Plaintiff's pleading is deficient on the merits as well. The Court has considered thoroughly the arguments and submissions of the parties in connection with these motions. For the reasons that follow, Defendants' motion to dismiss is granted.

BACKGROUND

The Court construes all of Plaintiff's well-pleaded, non-conclusory allegations as true in deciding a Rule 12(b)(6) motion to dismiss. The allegations material to the resolution of this motion are as follows. Plaintiff was a shareholder of Jarden at all relevant times. Nominal Defendant Jarden is a corporation organized under Delaware law with its headquarters located in New York. Jarden is a provider of consumer products used in and around the home. (Compl. ¶ 15.) The ten Defendants are named as follows: Martin E. Franklin ("Franklin"), Ian G.H. Ashken ("Ashken"), James E. Lillie ("Lillie"), John David Tolbert ("Tolbert"), Douglas W. Huemme

---

[1] In finding that it has diversity jurisdiction, the Court disregards the citizenship of Jarden because it is a nominal Defendant. See Matsumura v. Benihana Nat'l Corp., No. 06 Civ. 7609 (NRB), 2007 WL 1489758, *3 (S.D.N.Y. May 21, 2007) (citing Navarro Sav. Ass'n v. Lee, 446 U.S. 458, 460 (1980)).

("Huemme"), Richard L. Molen ("Molen"), Irwin D. Simon ("Simon"), Robert L. Wood ("Wood"), Rene-Pierre Azria ("Azria") and Charles R. Kaye ("Kaye").

Eight Defendants were directors of Jarden at all relevant times and at the time the complaint was filed: Franklin, Ashken, Huemme, Molen, Simon, Wood, Azria and Kaye. (Compl. ¶ 66.) Of these eight director-Defendants, only two, Franklin and Ashken, were also employees of Jarden at all relevant times: Franklin was chief executive officer ("CEO") and Ashken was chief financial officer ("CFO"). (Id. ¶¶ 16, 17.)

*Rise and fall of Jarden stock price*

In 2005, Jarden made a deal with two private equity firms to secure financing for a planned acquisition of American Household Incorporated ("AHI") for $845.6 million. The deal required the issuance of $350 million of convertible preferred stock. In order to complete the purchase of AHI, Jarden needed to force the conversion of the convertible stock to common stock, which in turn required the price of Jarden's common stock to rise rapidly within a relatively short period of time. (Compl. ¶¶ 6-8.)

On June 23, 2005, Jarden signed a new employment contract with Franklin. The contract linked Franklin's compensation as CEO directly to the rise in price of Jarden's common stock. For example, Franklin would receive 475,000 shares of Jarden stock if the stock price rose above $56 per share by or before November 1, 2005, a compensation element worth approximately 14 times Franklin's base salary for the year, and Franklin would receive another 440,000 shares if the price rose to $64 a share. (Compl. ¶¶ 9, 14.)

On or about June 29, 2005, Jarden announced that it would acquire Holmes Group, Inc. ("Holmes"). Jarden issued a statement noting that Holmes had achieved a $95 million

Earnings Before Deductions for Interest, Taxes, Depreciation and Amortization ("EBITDA") in 2004, and that the Holmes acquisition would drastically increase Jarden's profit margins and revenue. Franklin and Ashken also individually made various financial projections. (Compl. ¶¶ 10, 48-49.) On the next business day following the announcement, Jarden's stock price rose from $50.22 per share to $55.20 per share. (Id. ¶ 11.) The share price reached $59.96 on July 8, and Jarden converted the convertible stock to common stock on August 14. (Id. ¶¶ 11-12.)

Six months later, on January 11, 2006, Holmes' EBITDA for 2005 was announced to be $80 million. (Compl. ¶ 13.) Following this announcement, Jarden's stock price fell by $3.37. (Id.) Franklin publicly stated that "the original forecasts for Holmes provided to us at the time of the acquisition were overoptimistic." (Id. ¶¶ 13, 53.)

*Knowledge of adverse nonpublic information*

The complaint alleges that Defendants failed to disclose certain information to the public at and following the announcement of the Holmes acquisition and prior to January 2006. This information included the alleged fact that the financial information regarding Holmes' revenues that Jarden provided to the public was identical to the financial numbers communicated by Holmes' sales representatives to Jarden. (Compl. ¶ 10.) In addition, in 2004, Holmes had "lost" or "ended" a "deal" with Procter & Gamble ("P&G") that was "worth tens of millions of dollars," which was a "substantial sum." (Id. ¶¶ 10, 16-25, 41, 46, 56, 66(b)). This failed deal rendered unreasonable an expectation that Holmes would achieve the same EBITDA in 2005 as in 2004 (id. ¶ 46), although the complaint does not explain further what the "deal" was or the circumstances under which the "deal" had "ended" or been "lost." Lastly, the integration of Holmes with Jarden was difficult because it occurred during the busiest season of the year. (Id. ¶ 53.) Plaintiff alleges

that each Defendant "[knew] or should have known" this information, that Defendants failed to disclose this information to the public (id. ¶¶ 16, 56, 66), and that they "caused or allowed Jarden to" make statements in June, August and October 2005 touting Jarden's success without revealing the aforementioned information. (Id. ¶¶ 47, 48, 51.)

Defendants knew or should have known this information, according to the complaint, by virtue of "their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings" (Compl. ¶ 66(a); see also id. ¶¶ 16-25), their "advisory, executive, managerial and directorial positions" (id. ¶ 29), and the "ample opportunit[ies]" that they had to discuss this information with one another. (Id. ¶¶ 43-44.) In addition, director-Defendants Azria, Huemme and Wood were members of the board's Audit Committee, and according to the Audit Committee charter, its members should know "the type and presentation of information to be included in earnings press releases, including the use of 'pro forma' or 'adjusted' non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies." (Id. ¶ 42.) The Complaint alleges that the Audit Committee "allowed Franklin and Ashken to materially mislead Jarden stockholders and the public by failing to disclose that" Holmes would not achieve the same EBITDA in 2005 as it did in 2004 as a result of the failed P&G deal. (Id. ¶ 66(c).)

*Defendants' stock trades*

Plaintiff also asserts insider trading claims, but only against five of the Defendants: Franklin, Ashken, Azria, Huemme and Wood (collectively, "Insider Trading Director-Defendants"). The Holmes acquisition was announced on July 8, 2005. Between August 1 and

December 1, 2005, Franklin disposed of approximately 26% of his stock holdings, and Ashken sold 32% of his holdings.[2] In the same time period, Azria sold 77% of his holdings, Huemme sold 40% of his holdings and Wood sold 73% of his holdings. (Id. ¶¶ 58, 66(a).)

*Demand futility*

Plaintiff did not make a demand on the Jarden board to sue any of the Defendants on any of the claims asserted in the complaint. (Compl. ¶ 66.) In attempting to explain why making such a demand would be futile, Plaintiff asserts that the five Insider Trading Director-Defendants, by virtue of their insider trading activities, have a personal financial stake in the litigation rendering them interested for purposes of considering any demand (id. ¶ 66(a)), and that all the Defendants were interested parties due to their breaches of fiduciary duty stemming from their failure to prevent Franklin or others from making misleading statements and/or concealing material information. (Id. ¶ 66(b)-(d).) Plaintiff also alleges that Molen, Simon and Wood serve on the Compensation Committee, which has the power to determine and approve the CEO's compensation level and make recommendations to the Board with respect to the compensation plans of non-CEO officers and directors. (Id. ¶ 66(e)-(f).)[3] Plaintiff additionally lists Franklin's and Ashken's past

---

[2] On July 8, 2005, Franklin and Ashken adopted new 10b5-1 stock trading plans. These plans each involved an "initial sale" of shares, followed by a set schedule of quarterly sales. The number of shares that would be sold on a quarterly basis would be reduced by 33% from the previous program. (Compl. ¶ 61.) However, the volume and timing of Franklin's and Ashken's trades alleged to have actually occurred following the implementation of these plans do not appear to correspond with the 10b5-1 schedules.

[3] The complaint alleges that the Compensation Committee makes recommendations with respect to non-CEO compensation, but it is not clear whether the term "non-CEO" is limited to non-CEO officers. Because Plaintiff later alleges that the Compensation Committee has power over "the other Defendants' awards" (Compl. ¶

and present common board memberships with each other, alleges repeatedly that Defendants would never vote to sue themselves, notes that Jarden's directors' and officers' liability insurance policy precludes coverage for actions brought by Jarden against Defendants (known as an "insured vs. insured exclusion"), and alleges that a vote to approve a derivative suit would increase the probability of Defendants' personal liabilities in separate unspecified securities class actions. (Id. ¶ 66(g), (i), (m), (p), (r), (s).) Therefore, Plaintiff alleges, a demand would have been futile.

DISCUSSION

It is a long held principle of corporate law that directors manage the business of the corporation. Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000). Where a shareholder brings a derivative lawsuit on behalf of the corporation against the directors based on their actions or failure to act, there is a threshold question of standing, focused on whether the shareholder has exhausted intracorporate remedies, namely, whether the shareholder has made a demand on the board of directors. Fed. R. Civ. P. 23.1; accord Del. Ch. Ct. R. 23.1. Federal Rule of Civil Procedure 23.1 requires that the complaint "state with particularity any effort by the plaintiff to obtain the desired action from the directors . . . and the reasons for not obtaining the action or not making the effort." Id.; accord Del. Ch. Ct. R. 23.1. Because Rule 23.1 requires that Plaintiffs make particularized allegations, it imposes a pleading standard higher than the normal standard applicable to the analysis of a pleading challenged under Rule 12(b)(6). In re Trump Hotels S'holder Derivative Litig., Nos. 96 Civ. 7820 (DAB), 96 Civ. 8527 (DAB), 2000 WL 1371317, *6 (S.D.N.Y. Sept. 21, 2000).

---

66(e)), the Court will assume that "non-CEO" includes both non-CEO officers and non-CEO directors.

In the instant matter, Plaintiff concedes that he did not make a demand on the Jarden board. His standing to raise the claims on Jarden's behalf therefore turns on the question of demand futility. The Court evaluates demand futility according to the law of the state in which the company is incorporated, and therefore applies Delaware state law here. In re Trump Hotels, 2000 WL 1371317, at *6 (citing Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991)).

*Demand Futility Standard*

The parties do not dispute, and the Court concludes that, because Plaintiff does not challenge a specific board action, the appropriate demand futility test to apply is the one established by the Delaware Supreme Court in Rales v. Blasband, 634 A.2d 927 (Del. 1993). In Rales, the Delaware Supreme Court held that, "where the subject of the derivative suit is not a business decision of the board," id. at 934, plaintiffs seeking to establish demand futility must plead particularized facts that create a reasonable doubt that a majority of the directors are disinterested or independent. See id. at 933-34. Such reasonable doubt must be raised with respect to the board of directors sitting at the time the complaint is filed, see Harris v. Carter, 582 A.2d 222, 228 (Del. Ch. 1990), and in cases where the number of directors is even, reasonable doubt need only be raised as to half of the board. See Beneville v. York, 769 A.2d 80, 87 (Del. Ch. 2000).[4] Whether or not "reasonable doubt" exists "must be decided by the trial court on a case-by-case basis" and not by any "rote and inelastic" criteria. Grobow v. Perot, 539 A.2d 180, 186 (Del. 1988), overruled on other grounds by Brehm.

---

[4] The rule that half of an even-numbered board is sufficient for demand futility purposes applies unless "Defendants in a particular case . . . argue that less than a board majority can cause the corporation to accept demand." Beneville, 769 A.2d at 87. Defendants do not raise such an argument here.

As already noted, at the time the complaint was filed, the Board consisted of eight members: Defendants Ashken, Azria, Franklin, Huemme, Kaye, Molen, Simon and Wood. (Compl. ¶ 66, 66(h).) The Court therefore analyzes whether the facts alleged in the complaint are sufficiently particularized to create any reasonable doubt as to at least four of these board members' disinterestedness or independence.

*Disinterestedness*

"Disinterested" in this context generally means that "directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit" from a decision whether or not to approve Plaintiff's derivative lawsuit. Aronson, 473 A.2d at 812.

Plaintiff argues that its allegations against the five Insider Trading Director-Defendants establish their interestedness because they each had a personal financial stake in a decision as to whether or not Jarden should sue them on the basis of those transactions—namely, the earnings reaped from their sales of Jarden stock between July 2005 and January 2006, comprising their alleged insider trading activities. Where plaintiffs assert that directors are not disinterested because the directors face a threat of liability, the complaint must contain enough particularized facts such that the "potential for liability is not 'a mere threat' but instead may rise to 'a substantial likelihood.'" Rales, 634 A.2d at 936 (citing Aronson, 473 A.2d at 815).[5] "Interested"

---

[5] Plaintiff argues that the "substantial likelihood of liability" standard is too onerous, asserting that "no Delaware case has ever applied the 'substantial likelihood of liability' test where, as here, directors reaped personal profits from challenged insider trading transactions." (Opp'n at 16.) However, in a Delaware case Plaintiff himself cites, Zimmerman v. Braddock, No. Civ.A. 18473-NC, 2005 WL 2266566, *7 (Del. Ch. Sept. 8, 2005), the court explicitly applied such a test in the insider trading context. See id. ("In the context of insider trading by fiduciaries, directors will be interested if they face a substantial likelihood of material, personal liability.").

director status is not established "whenever a derivative plaintiff cursorily alleges that [a director-Defendant] made sales of company stock in the market at a time when he possessed material, non-public information." Guttman v. Huang, 823 A.2d 492, 502 (Del. Ch. 2003). Rather, a court must analyze whether

> the plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition.

Id.; see also In re Forest Labs., Inc. Derivative Litig., 450 F. Supp. 2d 379, 390 (S.D.N.Y. 2006) (quoting Guttman); Zimmerman v. Braddock, No. Civ.A. 18473-NC, 2005 WL 2266566, *7 (Del. Ch. Sept. 8, 2005) (same). The elements of an insider trading claim under Delaware law require a showing that: "1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." In re Oracle Corp., 867 A.2d 904, 934 (Del. Ch. 2004) (citing Brophy v. Cities Service Co., 70 A.2d 5 (Del. Ch. 1949)).

Even if there were sufficient allegations to implicate the disinterestedness of Franklin and Ashken, the only directors who were also officers and the only Defendants specifically alleged to have made public statements concerning the acquisition, the complaint contains no particularized allegations that the remaining three Insider Trading Director-Defendants faced a substantial threat of liability for insider trading. Plaintiff's complaint is replete with cursory allegations that the three director Defendants knew "adverse, non-public" information during a time period in which they engaged in significant trading, but the Complaint offers no particularized facts providing support for these assertions. With respect to the alleged fact that financial projections were based on the same numbers that Holmes' sales representatives themselves were providing to

Jarden privately, there are no allegations as to how any of the three non-officer director Defendants would have known about the Holmes representatives' communications. Compare Fink v. Komansky, No. 03-cv-0388 (GBD), 2004 WL 2813166, *4 (S.D.N.Y. Dec. 8, 2004) (complaint "fails to allege with particularity precisely Defendants' role in those illegal acts"); In re Forest Labs., 450 F. Supp. 2d at 390 (complaint contained merely "conclusory statements that the directors of Forest 'participated in, approved, and[/]or permitted the wrongs alleged' in the Complaint, without particularized allegations tending to establish that the Outside Directors had knowledge of any alleged misrepresentations"); with In re Tel-Save Sec. Litig., 98 Civ. 3145, 1999 WL 999427, *5 (E.D. Pa. Oct. 19, 1999) (in Rule 9(b) context, knowledge of misstatements made in connection with major transactions attributable to Defendant where it was specifically alleged that Defendant single-handedly negotiated those transactions).

With respect to the "failed" P&G "deal" of 2004, the complaint is far from clear as to what this "deal" was about or the circumstances of the deal's "failure." Nothing particularized about the nature, substance or importance of this deal, or the percentage of Holmes' 2004 revenues or 2005 revenues that was or would have been represented by the P&G business, or even whether the information regarding the status of the deal was non-public, is alleged. Similarly, there are no particularized allegations as to whether, how or when the three director-Defendants learned about the P&G deal, much less any particularized allegation that any of these director-Defendants knew that the failed P&G deal would have made an EBITDA of $95 million unreachable in 2005. See Rattner v. Bidzos, No. Civ. A. 19700, 2003 WL 22284323, *10 (Del. Ch. Oct. 7, 2003) ("The conclusory assertions . . . fail to allege with particularity what information the directors knew and how they acquired such knowledge."). While it might be reasonable to infer generally that a "failed deal" worth "tens of millions of dollars" would be material to a company's EBITDA, there are no

particularized allegations whatsoever explaining how the specific failed deal in this case was material to Holmes' earnings (much less Jarden's) in 2005. The complaint simply alleges conclusorily that the three director-Defendants should have disclosed that the failed P&G deal would make a $95 million EBITDA unreachable in 2005. This cursory allegation is plainly insufficient for demand futility purposes.

The last piece of allegedly material, non-public information cited in the complaint concerns alleged "integration problems," which the Court assumes is a reference to the announcement in Jarden's January 2006 press release that the integration of Holmes and Jarden was difficult because it took place at the busiest time of the year. However, the complaint offers nothing beyond a mere paraphrase of the press release language. There is no particularization of the nature of the integration problems, their effect on the business, or the financial materiality of such problems to Holmes or Jarden, nor are there any particularized allegations as to how or when any of the three director-Defendants would have known of the problems.

Plaintiff's reliance on his allegations of the three directors' trading activities between July 2005 and January 2006 is also misplaced. There are no particularized allegations of these Defendants' trading activities before or after the relevant period from which it could be inferred that their trading activities were unusual for that period. See Rattner, 2003 WL 22284323, at *10 ("The Amended Complaint contains no particularized facts regarding the timing of the Director Defendants' trades in relation to permitted trading periods"). Furthermore, the facts that the earliest of the trades occurred on August 1, 2005, one month after the announcement of the Holmes acquisition, and that the remainder spanned a period of around four months, further undermine Plaintiff's theory of insider trading, or at least it does not aid Plaintiff in satisfying his particularity requirement. Compare Rattner, 2003 WL 22284323, at *10 ("the Amended Complaint

often refers to allegedly improper sales . . . as occurring over nearly a one-month time span. While not determinative, certainly the failure of Rattner to pinpoint the timing of the challenged sales detracts from her alleged theory of selling soon after the release of misleadingly bullish statements"); with In re Gen. Instrument Corp. Sec. Litig., 23 F. Supp. 2d 867, 874 (N.D. Ill. 1998) (trading concentrated in one-week time period). Therefore, the alleged facts that Huemme sold 40% of his holdings and that Azria and Wood sold about 75% of their holdings during the relevant period, where no prior trading practices whatsoever are alleged, is insufficiently particularized to permit the Court to infer a substantial likelihood of insider trading liability for these three Defendants. See Guttman, 823 A.2d at 504 ("the mere fact that two of the directors sold large portions of their stock [100% and 50%] does not, in my view, support the conclusion that those two directors face a real threat of liability").

The Court is unpersuaded by Plaintiff's repeated citations to Strougo v. Caroll, Civ. A. No. 8040, 1991 WL 9978 (Del. Ch. Jan. 29, 1991), In re Storage Tech. Corp. Sec. Litig., 804 F. Supp. 1368 (D. Colo. 1992), In re Oxford Health Plans, Inc., 192 F.R.D. 111 (S.D.N.Y. 2000), and In re Gen. Instrument Corp. Sec. Litig., 23 F. Supp. 2d 867 (N.D. Ill. 1998). In none of those cases did the courts discuss the specifics of the pleadings that were found to be sufficiently particularized, and Plaintiff makes no effort to compare the facts alleged in the complaints in those cases with those alleged in Plaintiff's own complaint.

For these reasons, even if the complaint sufficiently alleges that Franklin and Ashken faced a substantial threat of liability for alleged insider trading activities by virtue of their high-ranking officer positions and direct involvement in the acquisition, Plaintiff has failed to put forth particularized allegations that create a reasonable doubt as to the disinterestedness of the remaining three director-Defendants alleged to have committed insider trading. Plaintiff is

therefore unable to meet the four-director threshold necessary to plead demand futility on the basis of insider trading liability.

Plaintiff further asserts that all the director-Defendants were interested because of their failure to prevent Jarden from issuing misleading statements in June 2005 that resulted in the artificially inflated stock prices, such that they all face a substantial likelihood of liability on Plaintiff's breach of fiduciary duty and other claims premised on Defendants' alleged failure of oversight. See generally Caremark Int'l Derivative Litig., 698 A.2d 959 (Del. Ch. 1996). However, there are no particularized allegations regarding the types of controls that would have prevented the misleading statements from being issued. Moreover, Plaintiff's failure to put forth particularized pleadings of actual knowledge of material non-public information with respect to the three non-officer director-Defendants accused of insider trading extends to the remaining three non-officer director-Defendants for the same reasons discussed in that section, and because Plaintiff fails to articulate with particularity the nature of the director-Defendants' roles such that they should have known the allegedly material, non-public information at issue, Plaintiff has failed to make the requisite showing that any of the six non-officer director-Defendants faced a substantial likelihood of liability for their alleged failure of oversight.

Plaintiff's repeated assertions, in various formulations, that a demand on the Board would be tantamount to asking the director-Defendants to "sue themselves" and Plaintiff's allegation that the Defendants' directors' and officers' liability insurance policies have an "insured vs. insured" exclusion that precludes coverage for derivative suits filed against them are also insufficient to create a reasonable doubt as to disinterestedness. See Ferre v. McGrath, No. 06 Civ. 1684 CM, 2007 WL 1180650, at *7 (S.D.N.Y. Feb. 16, 2007) ("The rote allegation that directors would have to sue themselves has been consistently rejected as a basis for excusing demand . . . .

The existence of a so-called 'insured versus insured' exclusion . . . likewise fails to establish director interest. Indeed, this argument has been rejected repeatedly under Delaware law."). Plaintiff's allegation that a derivative suit would expose the director-Defendants to increased chances of liability in securities class actions, without any specification or description whatsoever of these class actions or why particularized allegations, if true, would expose Defendants to a substantial likelihood of liability in such litigation, also fails to satisfy the demand futility requirement of particularized pleading. See Rattner, 2003 WL 22284323, at *14 ("The only particularized facts . . . regarding the federal securities class action lawsuits are that such suits were filed and are pending . . . . These conclusory and cryptic allegations are insufficient to satisfy the demand excusal requirements . . .").

Lastly, Plaintiff's repeated allegations that the director-Defendants, by virtue of their positions on the Board and/or the Audit Committee, knew or should have known of the material non-public information are also insufficient to meet the level of particularity required to demonstrate demand futility. Plaintiff merely alleges that the individual Defendants had access to unspecified "corporate documents," "financial information," or information contained in earnings press releases, but these vague descriptions do not establish a particularized connection between the Defendants' roles and any wrongdoing. Compare Fink, 2004 WL 2813166, at *5 ("While the Amended Complaint speculates that these frequent meetings indicate that the Board had knowledge of Merrill Lynch and Enron's unlawful business dealings, the Amended Complaint is devoid of specific facts to indicate that the subject matter of these meetings were the transactions at issue"); Guttman, 823 A.2d at 503 (complaint failed to allege with particularity the "precise roles that [the director Defendants] played at the company [and] the information that would have come to their attention in those roles, and any indication as to why they would have perceived the accounting

irregularities"); Rattner, 2003 WL 22284323, at *10 (same, where complaint merely alleged that Defendants had access to "financial statements, markets and present and future business prospects via access to internal corporate documents, . . . conversations and connections with other corporate officers and employees . . ."); In re Forest Labs., 450 F. Supp. 2d at 390 ("The Complaint does not identify any types of reports, studies, or analyses made available to the Board, or board meeting minutes reflecting conversations from which the Court may infer that the Outside Directors had actual knowledge of the Danish Study or any other alleged inside information"); with Zimmerman, 2005 WL 2266566, at *8 n.81 (knowledge imputed to director Defendants in demand futility analysis, where complaint alleged that the Defendants had access to "Pricing Reports, Demographic Analyses, Network Operations Center Reports, and Promotion Reconciliation Reports," which contained "detailed enough information to reveal the difficulties Priceline faced"); In re Biopure Corp. Derivative Litig., 424 F. Supp. 2d 305, 308 (D. Mass. 2006) (same, where complaint alleged knowledge that the corporation's "primary product or service" was in jeopardy); cf. In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 387-88 (E.D.N.Y. 2003) (similarly comparing cases, albeit in Rule 9(b) context).

The complaint thus does not create any reasonable doubt as to at least four of the director-Defendants' disinterestedness. Therefore, the Court next considers whether there are particularized allegations with respect to the independence of at least four members sitting on the Board at the time the complaint was filed.

*Independence*

In the demand futility context, "independent" means that "a director's decision is based on the corporate merits of the subject before the Board rather than extraneous considerations

or influences." Aronson, 473 A.2d at 816.

Plaintiff argues that Franklin and Ashken lack independence because of their past business associations, and because their compensation is unilaterally determined by the Compensation Committee, which consists of three of the director-Defendants -- Molen, Simon and Wood. However, even if a reasonable doubt is raised with respect to Franklin and Ashken,[6] there are insufficient particularized allegations that would implicate the independence of any other director-Defendant. Plaintiff attempts to show that all the director-Defendants are beholden to the Compensation Committee, but the Complaint merely alleges that the Compensation Committee had the power to make "recommendations" with respect to the compensation of the non-CEO directors.[7] There are no particularized allegations as to the recommendation process and there are no particularized examples of situations where Molen, Simon and Wood ever excised domination and control over the other directors through their influence on the Committee. Therefore, the pleadings do not suggest that any of the remaining six directors are so beholden to Molen, Simon or Wood, such that their independent discretion would be effectively eliminated; accordingly, no reasonable doubt of independence is raised as to the remaining six director-Defendants on that basis.

In all other respects, Plaintiff's allegations simply lack specificity concerning any improper benefit that might or would accrue to any of the other six director-Defendants for voting

---

[6] The assertion that Ashken's compensation is determined solely by the Compensation Committee is actually found only in Plaintiff's opposition papers rather than the complaint. (See Opp'n at 18.)

[7] The complaint also alleges that the Compensation Committee "singularly control[s] the other Defendants' awards," (Compl. ¶ 66(e)) but there is no particularized allegation as to how the committee's mere ability to "recommend" directors' fees gives them the ability to "singularly control" directors' fees and awards.

against a demand to sue any other Defendant, unlike the pleadings at issue in the cases on which Plaintiff relies. See, e.g., Int'l Equity Capital Growth Fund, L.P. v. Clegg, No. Civ.A. 14995, 1997 WL 208955, at *3 (Del. Ch. Apr. 22, 1997) (demand was futile where Defendant-CEO was also a majority shareholder of the nominal-Defendant corporation and could, and indeed did on several occasions, unilaterally fire any board member who exercised independent judgment); In re New Valley Corp. Derivative Litig., No. Civ.A. 17649, 2001 WL 50212, at *7 (Del. Ch. Jan. 11, 2001) (demand was futile where, in an action alleging impropriety of Defendant-directors' approval of a substantial purchase of the assets of another corporation, several Defendants held substantial equity in or were employed by the other corporation); Haseotes v. Bentas, No. Civ.A. 19155 NC, 2002 WL 31058540 (Del.Ch. 2002) (demand on particular director-Defendant to vote to approve a lawsuit against his sister director-Defendant was futile where, without conceivable reason, director-Defendant once sued a partnership and every single partner in the partnership except his sister).

Therefore, even if there were sufficient allegations to implicate the independence of Franklin and Ashken, Plaintiff's complaint still fails to create a reasonable doubt as to the independence of at least four director-Defendants.

*Corporate Waste*

Plaintiff's complaint also appears to raise, but the parties do not address in their motion papers, a claim of corporate waste premised on the incentive compensation package provided to Franklin, which promised Franklin additional awards of stock if Jarden's stock price reached a certain level by November 1, 2005. No director other than Franklin, however, is alleged to have any interest whatsoever in the transaction, and no reasonable doubt of independence is raised for any other director for the same reasons discussed above. To the extent that Franklin's

employment contract constituted board action, the Aronson test[8] would permit Plaintiff to demonstrate demand futility by raising, through particularized allegations, a reasonable doubt that the incentive package was the exercise of reasonable business judgment. However, Plaintiff puts forth no particularized allegations whatsoever that purport to question Defendants' business judgment in approving that package, nor does the Court find that the mere size of the incentive package, especially without any accompanying particularized allegations of Jarden's budget, holdings, or earnings, is so large or unreasonable that "no person of ordinary, sound business judgment could conclude" that the package "represent[s] a fair exchange," Steiner v. Meyerson, Civ. A. No. 13139, 1995 WL 441999, *1 (Del. Ch. July 19, 1995), especially given the alleged necessity of raising Jarden's stock prices drastically in a short amount of time. See Strougo, 1991 WL 9978, at *5 (Plaintiff failed to establish demand futility for corporate waste claim on business judgment grounds, where plaintiff alleged that the recipient received a substantial salary). Therefore, Plaintiff's claim of corporate waste is also dismissed for failure to plead demand futility.

On the basis of the foregoing, the complaint does not create any reasonable doubt as to at least four director-Defendants' disinterestedness or independence. The complaint also fails to create a reasonable doubt as to the reasonableness of the Board's business judgment with respect to Franklin's incentive-compensation package. Therefore, Plaintiff's claims will be dismissed for failure to plead demand futility pursuant to Rales and accordingly, it is unnecessary to address the parties' brief and conclusory arguments with respect to whether the complaint sufficiently states a claim on the merits. Plaintiff may, however, bring his claims against Defendants following a

---

[8] Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000).

proper demand on the Jarden board. See Grossman v. Johnson, 674 F.2d 115, 125-26 (1st Cir. 1982); Shlensky v. Dorsey, 574 F.2d 131, 141-42 (3d Cir. 1978).

## CONCLUSION

For the foregoing reasons, the Court dismisses Plaintiff's claims for failure to demonstrate demand futility as required by Fed. R. Civ. P. 23.1, without prejudice to any claims that may be raised by Plaintiff on behalf of Jarden following a proper demand on the Jarden board.

The Clerk of Court is respectfully requested to terminate Docket Entry No. 14, enter judgment accordingly, and close this case.

Dated: New York, New York
September 29, 2008

LAURA TAYLOR SWAIN
United States District Judge